# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| GLEN JOHNSON, TIMOTHY GILLEN, KYLE JONES, STEVEN HALL, CLAYTON JOHNSON, MARK HUBBARD, STEVE PIPER, and BILL PATT, *as Trustees of the Operating Engineers Local #49 Health and Welfare Fund;* MICHAEL R. FANNING, *as a Fiduciary of the Central Pension Fund of the International Union of Operating Engineers and Participating Employers;* JOSEPH RYAN, BRUCE CARLSON, GLEN JOHNSON, FRANK FRATTALONE, LEE HILLER, TONY PHILLIPI, GREG WAFFENSMITH, and MARK RYAN, *as Trustees of the Local #49 International Union of Operating Engineers and Associated General Contractors of Minnesota Apprenticeship and Training Program;* THE OPERATING ENGINEERS LOCAL #49 HEALTH AND WELFARE FUND; THE CENTRAL PENSION FUND OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS AND PARTICIPATING EMPLOYERS; and THE LOCAL #49 INTERNATIONAL UNION OF OPERATING ENGINEERS AND ASSOCIATED GENERAL CONTRACTORS OF MINNESOTA APPRENTICESHIP AND TRAINING PROGRAM, | Civil No. 15-3237 (JRT/DTS) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER SETTING ASIDE ENTRY OF DEFAULT** |
| v. | |
| ALLIED EXCAVATING, INC. and JEFFREY JEWISON, | |
| Defendants. | |

Christy E. Lawrie, **McGRANN SHEA CARNIVAL STRAUGHN & LAMB, CHTD**, 800 Nicollet Mall, Suite 2600, Minneapolis, MN 55402, for plaintiffs.

Susan E. Tegt, **LARKIN HOFFMAN DALY & LINDGREN, LTD**, 8300 Norman Center Drive, Suite 1000, Minneapolis, MN   55437, for defendants.

Plaintiffs are three multi-employer jointly-trusteed fringe benefit plans and their fiduciaries and trustees (collectively the "Funds").   Defendant Allied Excavating, Inc. ("Allied") is an employer who executed a collective bargaining agreement ("CBA") with the Associated General Contractors of Minnesota, Highway, Railroad, and Heavy Construction Division and the International Union of Operating Engineers, Local No. 49 (collectively, the "Union").[1]   Defendant Jeffrey Jewison ("Mr. Jewison") is one of Allied's corporate officers.[2]   The Funds served the summons and complaint on Defendants on August 10, 2015.   On September 2, 2015, after Defendants failed to respond to the action, the Clerk of Court granted the Funds' application for entry of default pursuant to Fed. R. Civ. P. 55(a).   The Funds now move, pursuant to Fed. R. Civ. P. 55(b)(2), for entry of default judgment in the amount of $141,481.55 against Allied and $75,569.85 against Mr. Jewison.   Defendants move for the Clerk's entry of default to be set aside pursuant to Fed. R. Civ. P. 55(c).

The Court finds that there is good cause to set aside the default, given that Defendants' delay was excusable, they have a potentially meritorious defense, and any resulting likelihood of prejudice to the Funds is low.   Therefore, the Court will grant

---

[1] The Funds were created and maintained pursuant to 29 U.S.C. § 186(c) and are administered in accordance with the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (2012).

[2] Allied and Mr. Jewison are collectively referred to as "Defendants."

Defendants' motion to set aside the entry of default and will deny as moot the Funds' motion for entry of judgment.

# BACKGROUND

Defendants have had a contractual relationship with the Union going back to at least 2002. On August 29, 2011, Allied's CEO Pamela Jewison ("Ms. Jewison") executed a CBA with the Union effective May 1, 2011, to April 30, 2014. (Decl. of Michael Streater ("Streater Decl."), Ex. N ("First CBA"), Feb. 22, 2017, Docket No. 42; Aff. of Mike Streater ("Streater Aff."), Ex. B at 49, Dec. 16, 2015, Docket No. 13.) On January 7, 2015, Ms. Jewison executed a subsequent CBA with the Union effective through April 30, 2017.[3] (Streater Aff., Ex. A ("Second CBA"); *id.*, Ex. B at 50.) At all relevant times, the applicable CBA required Allied to make monthly contributions to the Funds on behalf of employees for hours worked on tasks covered by the CBA. (First CBA at 15-17; Second CBA at 15-17.)

---

[3]All page references to the CBAs are to internal pagination as opposed to CM/ECF pagination.

Based on the record, it appears that the First CBA – executed August 29, 2011 – remained in force beyond its stated expiration date until the Second CBA was executed. (*See* First CBA at 18 (stating that the CBA "shall remain in full force and effect through April 30, 2014," and in the absence of notice from either party sixty days before expiration, the CBA will be "renewed automatically for a further period of twelve (12) months"; also stating that if such notice is given by either party "and a new Agreement is not signed before the expiration of this Agreement, then this Agreement shall continue in force until a new Agreement is signed").)

In addition, prior to the execution of the relevant CBAs, on March 16, 2002,[4] Mr. Jewison (then CEO of Allied) executed the Operating Engineers Local #49 Health and Welfare Fund Participating Agreement ("Welfare Participating Agreement"). (Streater Aff., Ex. C.)  The Welfare Participating Agreement, which complements the CBA in force at any given time, specifically obligates Allied to make contributions to the Operating Engineers Local #49 Health and Welfare Fund (the "Health & Welfare Fund") as specified in the applicable CBA, and it also purports to bind in an individual capacity any corporate officer signing on behalf of an employer.  (*Id.*)  The Welfare Participating Agreement is "in effect for the period stipulated in [the CBA applicable at the time of execution] and any renewal or extension thereof."  (*Id.*)

The CBA gives the Funds the right to examine Allied's payroll and employment records at any reasonable time in order to determine if the company is in compliance with its fringe benefit obligations.  (Second CBA at 16; First CBA at 16.)  Pursuant to this authority, in February 2015, the Funds selected Allied for an audit and requested access to Allied's records going back to January 1, 2014.  (Streater Decl. ¶ 2; *id.*, Ex. F.)  After numerous unanswered requests over many months, (*id.* ¶¶ 2-7), on August 7, 2015, the Funds filed this lawsuit pursuant to 29 U.S.C. § 1145.[5]  The Funds originally sought

---

[4] The Court assumes that Allied has been a signatory to the Union's CBAs going back as far as March 16, 2002.

[5] ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained

(Footnote continued on next page.)

injunctive relief requiring Allied to provide the requested documents.   The Funds also seek to collect any unpaid contributions as well as attorney fees and damages as permitted under the terms of the CBA and by statute.[6]   Defendants were personally served with process on August 10, 2015.   (Summons Returned Executed on Jeffrey Jewison, Aug. 12, 2015, Docket No. 4; Summons Returned Executed on Allied Excavating, Inc., Aug. 12, 2015, Docket No. 5.)

_____

(Footnote continued.)

      agreement shall, to the extent not inconsistent with law, make such contributions
      in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.  In turn, § 1132(a) permits plans fiduciaries to initiate civil actions against employers who owe delinquent contributions.

    [6] The CBA provides that if an employer becomes "delinquent" in terms of their fringe benefit contributions, the Funds are entitled to liquidated damages equal to fifteen percent of the unpaid contributions as well as all costs of collection including attorney fees and costs.  (Second CBA at 15-16; First CBA at 15-16.)   In addition, ERISA entitles plan fiduciaries to certain damages upon entry of judgment in an enforcement action for delinquent contributions as follows:

      In any action . . . by a fiduciary for or on behalf of a plan to enforce [29 U.S.C.
      § ]1145 . . . in which a judgment in favor of the plan is awarded, the court shall
      award the plan –

      (A)    the unpaid contributions,

      (B)    interest on the unpaid contributions,

      (C)    [liquidated damages provided for under the plan not to exceed twenty
              percent]

      (D)    reasonable attorney's fees and costs of the action, to be paid by the
              defendant, and

      (E)    such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2).

Defendants did not respond to the complaint in the time required under law, and on September 1, 2015, the Funds applied for entry of default under Fed. R. Civ. P. 55(a). (Appl. for Entry of Default, Sept. 1, 2015, Docket No. 6.)   The Clerk entered default the following day.   (Clerk's Entry of Default, Sept. 2, 2015, Docket No. 9.)   Though they made no formal appearance in Court, shortly after the lawsuit was filed, Defendants communicated directly with the Funds regarding the document requests.   (Decl. of Melissa Urban-Brown ("Urban-Brown Decl.") ¶ 3, Feb. 22, 2017, Docket No. 44.) Eventually, on September 16, 2015, Defendants provided the auditor access to selected documents.   (Streater Decl. ¶ 11.)   After additional requests, Allied provided more records between January 25 and April 18, 2016.   (Streater Decl. ¶¶ 12-14; Decl. of Christy E. Lawrie ("Lawrie Decl.") ¶¶ 4-7, Feb. 22, 2017, Docket No. 45.)

Based on the documents Defendants provided, in April 2016 the Funds' auditor completed an audit invoice.   (Aff. of Michael Streater ¶ 6, July 18, 2016, Docket No. 23.) The auditor concluded that Defendants owed $158,462.54 in delinquent contributions, of which $76,583.38 was owing to the Health & Welfare Fund (and thus, Mr. Jewison would be personally responsible for this amount).   (*Id.*)   In addition, the auditor determined the Funds were entitled to $23,769.38 in liquidated damages, $11,487.51 of which was due to the Health & Welfare Fund.   (*Id.* ¶ 7.)   The auditor sent a copy of the audit invoice to Allied on May 2, 2016.   (Streater Decl. ¶ 18.)   On July 18, 2016, the Funds filed the instant motion for entry of judgment against Defendants based on the auditor's calculations.

Defendants finally retained counsel in August 2016, (*see* Lawrie Decl. ¶ 11); the following month, Defendants provided additional documentation to the Funds, (*id.* ¶ 13). As a result of this new information, the Funds revised their audit, removing 2,865 hours of work.   (Streater Decl. ¶ 23.)   This reduced the total delinquent contributions by $47,000.  (*Id.*)

On February 15, 2017, shortly before the scheduled hearing on the Funds' motion for entry of judgment, Defendants filed a motion to set aside the default pursuant to Fed. R. Civ. P. 55(c).  Defendants argue there is good cause to set aside the default because their delay in responding to the lawsuit was excusable, the Funds will not be prejudiced if the default is set aside, and they have three meritorious defenses.  First, Defendants argue that the Welfare Participating Agreement did not effectively bind Mr. Jewison in his personal capacity.  Second, they assert that the CBA between Allied and the Union was orally terminated in March 2015, based on conversations the Jewisons had with Doug Zila, a former Business Representative for the Union.  (See Decl. of Pamela Jewison in Supp. of Defs.' Mot. to Set Aside Entry of Default ("Decl. of Pamela Jewison"), Ex. B, Feb. 15, 2017, Docket No. 36.)   And third, they claim the revised audit is overstated because it includes hours worked that are not covered by the CBA.

## ANALYSIS

## I.   MOTION TO SET ASIDE THE DEFAULT

[Fed. R. Civ. P.] 55(c) provides that the district court may set aside an entry of default "[f]or good cause shown," and may set aside a default judgment "in accordance with Rule 60(b)."  Although the same factors are typically relevant in deciding whether to set aside entries of default [for good cause]

> and default judgments [under Fed. R. Civ. P. 60(b)], "[m]ost decisions . . . hold that relief from a default judgment requires a stronger showing of excuse than relief from a mere default order."  *Conn. Nat'l Mortg. Co. v. Brandstatter*, 897 F.2d 883, 885 (7th Cir. 1990); *accord Shepard Claims Serv., Inc. v. William Darrah & Assocs.*, 796 F.2d 190, 193-94 (6th Cir. 1986); *Meehan v. Snow*, 652 F.2d 274, 276-77 (2d Cir. 1981).  This is a sound distinction.  There is a "judicial preference for adjudication on the merits," *Oberstar v. FDIC*, 987 F.2d 494, 504 (8th Cir. 1993), and it is likely that a party who promptly attacks an entry of default, rather than waiting for grant of a default judgment, was guilty of an oversight and wishes to defend the case on the merits.

*Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 783-84 (8th Cir. 1998).

Whether to set aside entry of default is "committed to the district court's discretion."  *Id.* at 785.  In determining whether to set aside an entry of default under the relatively "lenient" good cause standard, the Court weighs "whether the conduct of the defaulting party was blameworthy or culpable, whether the defaulting party has a meritorious defense, and whether the other party would be prejudiced if the default were excused."  *Id.* at 784.

## A.      Blameworthiness or Culpability

Whether a defaulting party's conduct is excusable is the primary factor relevant to whether there is good cause to set aside a clerk's entry of default.  *See id.* ("[W]e focus heavily on the blameworthiness of the defaulting party.").

> Whether the conduct of the moving party is excusable is an equitable determination that considers all germane circumstances surrounding the party's omission.  [*Johnson*, 140 F.3d at 784 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).]  Conduct that has been held excusable includes "late filings caused by inadvertence, mistake or carelessness."  *Pioneer*, 507 U.S. at 395.  A court will rarely excuse an intentional delay or disregard for deadlines and procedural rules. *Johnson*, 140 F.3d at 784.

*SICK, Inc. v. Motion Control Corp.*, No. 01-1496, 2002 WL 832609, at *2 (D. Minn. Apr. 30, 2002).

Defendants argue they mistakenly believed that their cooperation with the Funds' efforts to obtain Allied's records in order to complete the audit was a sufficient response to the complaint. They assert that even after the entry of default in September 2015, they were in contact with Doug Zila – then a Business Representative for the Union – and their belief that they were complying with the audit requirements was based on Zila's representations to them. Furthermore, Defendants argue that once they did retain counsel, their counsel worked diligently with the Funds' counsel to move forward in the case, and both sides had to cancel and reschedule meetings for legitimate reasons, which led to some additional excusable delay.

Delay based on a mere belief that cooperation with an audit is a sufficient response to a federal lawsuit, without more, may not amount to excusable conduct. *Cf. Bd. of Trs. of IBEW Local Union No. 100 Pension Tr. Fund v. Elijah Elec., Inc.*, No. 1:06-1860, 2008 WL 4490023, at *3-4 (E.D. Cal. Sept. 29, 2008) (setting aside entry of default in a similar context when the defendant argued that the delay was excusable because the defendant was actively engaged in the plaintiffs' audit process, but also finding it relevant, for the purpose of determining blameworthiness, that unlike in the case at hand, the defendant's attorney had abandoned him and the defendant had not received notice of events in the litigation because the court did not have his address). However, unlike in *Elijah*, the facts before the Court indicate not only that Defendants mistakenly believed

that cooperation with the audit was sufficient, but also that they held this belief because of representations made by a Union employee.  Defendants maintain that Zila assured Defendants that their cooperation with the documents was sufficient.  The Court finds that Defendants' reliance on a statement from a representative of the Union provides a colorable explanation for Defendants' mistaken belief that they need not respond in some other way in court, and this fact makes Defendants' delay excusable.

The Court notes that Defendants' delay was not as brief as in some cases in which a default has been set aside.  *See, e.g.*, *Johnson*, 140 F.3d at 783-84 (setting aside entry of default when the delay was "relatively brief," given that the defendant filed an answer to the complaint one day after the entry of default and moved for the default to be set aside less than two months later).  But length of delay alone is not dispositive on the question of culpability.  There is no evidence that Defendants acted in bad faith or intended the delay in order, for example, to take advantage of the Funds or manipulate the legal process.  *See, e.g.*, *Grant v. City of Blytheville*, 841 F.3d 767, 772-73 (8th Cir. 2016) (finding a district court did not abuse its discretion in setting aside the entry of default when the court "perceive[d] no bad faith or intentional effort to delay" by the defaulting party); *Johnson*, 140 F.3d at 784-85 (setting aside entry of default when the defaulting party continuously acted in good faith, among other reasons); *Iowa State Univ. Research Found., Inc. v. Greater Continents Inc.*, 208 F.R.D. 602, 604 (S.D. Iowa 2002) (finding the defaulting defendant was culpable when the defendant failed to appear as a litigation "strategy").  Given Defendants' plausible mistake, and without some showing that

Defendants' delay was intentional or the result of bad faith, the Court finds Defendants are not blameworthy or culpable for the delay.

### B.      Existence of a Meritorious Defense

"Whether a meritorious defense exists is determined by examining whether the proffered evidence would permit a finding for the defaulting party." *Stephenson v. El-Batrawi*, 524 F.3d 907, 914 (8th Cir. 2008) (internal quotation marks omitted). The task for the Court is not to resolve disputed facts, but rather, to determine whether the defendant has come forward with facts that, if true, would provide a defense. *See Johnson*, 140 F.3d at 785 (explaining that the defendant need not show that he or she will succeed on the merits or that the evidence is undisputed).

Defendants posit three defenses to the Funds' substantive claims: (1) as to the claims against Mr. Jewison in his individual capacity, the Welfare Participating Agreement did not effectively bind Mr. Jewison personally to make contributions to the Health and Welfare Fund; (2) the CBA between the Union and Allied terminated in March 2015; and (3) the Funds' audit is inaccurate, such that their damages demand is overstated.

### 1.      Mr. Jewison's Personal Liability

Defendants argue that the Welfare Participating Agreement is not enforceable against Mr. Jewison in his personal capacity because that document "does not evidence a clear intent to bind Mr. Jewison" personally. (Mem. of Law in Supp. of Defs.' Mot. to Set Aside Entry of Default ("Defs.' Mem.") at 10, Feb. 15, 2017, Docket No. 38.)

Defendants further argue that by executing the Welfare Participating Agreement, Mr. Jewison never possessed subjective intent to be personally bound, and therefore, he is not personally bound.

"Although [the Eighth Circuit has] held that Congress did not intend corporate officers to be personally liable under ERISA's definitions of 'employer' and 'person', such officers could be personally liable under ERISA if the terms of the plan imposed such liability on them." *Rockney v. Blohorn*, 877 F.2d 637, 643 (8th Cir. 1989). Minnesota contract law applies to the question of whether a contract personally binds a corporate officer. *Id.*

In Minnesota, a corporate officer may contractually guarantee a corporate debt. *See Baker v. Citizens State Bank of St. Louis Park*, 349 N.W.2d 552, 557-58 (Minn. 1984). "It is settled in this jurisdiction that a guaranty is construed the same as any other contract, the intent of the parties being derived from the commonly accepted meaning of the words and clauses used, taken as a whole." *Am. Tobacco Co. v. Chalfen*, 108 N.W.2d 702, 704 (Minn. 1961). "Unambiguous contract language must be given its plain and ordinary meaning, and shall be enforced by courts even if the result is harsh." *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999); *see also Atkins v. Hartford Cas. Ins. Co.*, 801 F.2d 346, 348 (8th Cir. 1986) ("If the court determines that there is no ambiguity, then the . . . interpretation of the contract is for the court to determine, as garnered from the four corners of the document." (citation omitted)); *Cooper v. Lakewood Eng'g & Mfg. Co.*, 874 F. Supp. 947, 953 (D. Minn. 1994) (same). In other words, the parties' "outward manifestation of assent is determinative, rather than

a party's subjective intention." *Speckel by Speckel v. Perkins*, 364 N.W.2d 890, 893 (Minn. Ct. App. 1985).

Defendants offer the following to support their argument that the Welfare Participating Agreement is ambiguous on its face as to whether Mr. Jewison is bound in his individual capacity: (1) the language purporting to bind Mr. Jewison in his individual capacity is "in small font in the fifth paragraph of the document," (Defs.' Mem. at 3); and (2) Mr. Jewison signed the Welfare Participating Agreement once on behalf of Allied (and, arguably, himself individually), and there is no separate signature line for Mr. Jewison to execute the document in his individual capacity.  However, the Welfare Participating Agreement is one page long, with the language regarding individual liability in the last of five paragraphs, all of which are in the same size font.  (Streater Aff., Ex. C.)  The operative language is just above the date and signature block; if anything, this placement evinces intent to emphasize rather than hide the relevant language.  (*Id.*) Furthermore, "[t]here is no requirement under Minnesota law of a separate signature line to hold someone personally liable." *Operating Eng'rs Local #49 Health & Welfare Fund v. Arrowhead Indus. Serv., Inc.*, No. 10-624, 2011 WL 1456781, at *3 (D. Minn. Apr. 15, 2011).

Defendants rely on a case in which a court in this district held that a similar type of agreement "[did] not include language that evinces a clear intent that [the defendant] fully understood and intended to assume personal liability." *Trs. of the Minn. Ceramic Tile & Allied Trades Ret. Fund v. His & Hers Ceramic Tile*, No. 01-978, 2002 WL 507018, at *2 (D. Minn. Apr. 1, 2002).  In *His & Hers Ceramic Tile*, the defendant

argued that among other reasons, the court should find she did not intend to be personally bound because the personal guarantee was not the subject of negotiations prior to execution and there was no separate signature block indicating intent to be individually bound. *Id.*

However, the court's decision in *His & Hers Ceramic Tile* was rooted in the lack of clear language in the agreement; the language purporting to bind the corporate officer in her individual capacity in that case was markedly less straightforward than the language in the Welfare Participating Agreement.[7]  Here, like other courts recently confronted with the same issue in relation to the same contract,[8]  the Court finds that the

---

[7] In *His & Hers Ceramic Tile*, the relevant language was as follows:

> This agreement is binding personally and individually upon each of the following: The Union, The Undersigned Employer, and each of the Individuals, Partners, Officers, or Stockholders of the Employer of the Undersigned.  Signators each certify that such signators have authority to enter into this agreement and to bind the persons and parties described in this paragraph.

2002 WL 507018, at *1.  In contrast, the relevant language in the Welfare Participating Agreement is:

> If this Agreement is signed for and in behalf of a corporation, the officer or officers signing for such corporation by the execution of this Agreement not only binds the corporation but individually binds himself to the full and faithful performance of the Agreement stated herein.

(Streater Aff., Ex. C.)

[8] *See, e.g., Johnson v. Charps Welding & Fabricating, Inc.*, No. 14-2081, 2016 WL 8200937, at *2 n.3 (D. Minn. June 27, 2016) (finding the same language unambiguously imposed personal liability on the signatory); *Arrowhead Indus. Serv.*, 2011 WL 1456781, at *2-3 (same).  *But see Operating Eng'rs Local # 49 Health & Welfare Fund v. Listul Erection Corp.*, 220 F. Supp. 2d 1042, 1044 (D. Minn. 2002) (holding the opposite).

plain language of the Welfare Participating Agreement is unambiguous on its face as to the question of Mr. Jewison's individual liability. Because the "outward manifestation of assent is determinative," as opposed to a party's "subjective intention," *Malcolm v. Harden & Harden, Inc.*, No. 03-5211, 2004 WL 2203407, at *2 (D. Minn. Sept. 23, 2004) (citation omitted), Defendants' argument as to Mr. Jewison's liability fails as a matter of law. The Court finds there is no likelihood that this defense will be meritorious if the default is set aside.

### 2.      Effectiveness of the CBA

Defendants also argue they have a defense to the Funds' claim that contributions are due for work completed after March 2015 because the CBA between the Union and Allied was terminated that month. Around March 2015, the Jewisons transferred at least a portion of the work covered by the CBA that had been done through Allied to a new company also operated by the Jewisons – Vortech Hydro Vac, Inc. ("Vortech"). (Decl. of Pamela Jewison ¶¶ 1, 3.) Apparently, the Union believed the Jewisons were shuttering Allied and shifting all operations to Vortech (Urban-Brown Decl. ¶¶ 4-5), but in reality it appears that at least some work that would have been covered under the CBA continued to be completed by employees of Allied, as opposed to Vortech. Defendants assert that they believed, based on a series of conversations they had with Mr. Zila, that the Union consented to essentially substitute Vortech for Allied. (Decl. of Pamela Jewison ¶¶ 3-6.)

Defendants have no written documentation of the CBA's termination.[9]   The Funds counter that termination of the CBA is not a defense in an ERISA action under 29 U.S.C. § 1145.

"Congress intended that [§ 1145] would simplify actions to collect delinquent contributions[ to ERISA funds], avoid costly litigation, and enhance the actuarial planning necessary to the administration of multiemployer pensions plans. *Cent. States, Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co.*, 919 F.2d 1343, 1348 (8th Cir. 1990).   Under the scheme Congress enacted, pension funds bringing suit to collect delinquent contributions are in "a better position than [they] would otherwise occupy in relation to the collective bargaining agreement" if they were treated as ordinary third-party beneficiaries under existing contract law. *Id.*  Thus, "suit [by a trustee] cannot be thwarted by defenses not apparent from the face of the [a]greement." *Id.* at 1349 (quoting *Bituminous Coal Operators' Ass'n, Inc. v. Connors*, 867 F.2d 625, 634 (D.C. Cir. 1989)).   The Eighth Circuit has only recognized two defenses in such an action (1) "that the pension contributions are themselves illegal or [(2)] that the collective bargaining agreement is void." *Id.*

A number of other circuits, as well as district courts in this circuit, have recognized that termination of the underlying CBA is an additional defense that may be available in such an action. *See Heimerl v. Tech Elec. of Minn., Inc.*, 9 F. Supp. 3d 1002, 1021-22 (D. Minn. 2014) (recognizing termination as a defense and collecting cases from

---

[9] Ms. Jewison executed a CBA and a Welfare Participating Agreement on behalf of Vortech on March 26, 2015.  (Decl. of Pamela Jewison ¶ 5 & Ex. A.)

other jurisdictions that have held the same).  The Eighth Circuit recently addressed this question and declined to recognize the termination defense based on the facts before it. *See Twin City Pipe Trades Serv. Ass'n, Inc. v. Frank O'Laughlin Plumbing & Heating Co.*, 759 F.3d 881, 885-86 (8th Cir. 2014) ("We decline to formally recognize a termination defense in this case . . . because the circumstances involved here would not support such a defense in any event.").

In the case at hand, at the motion to set aside entry of default, Defendants have demonstrated there is an issue of fact as to whether the parties to the CBA behaved in a way demonstrating "clear and explicit termination of the contract," *Heimerl*, 9 F. Supp. 3d at 1022, and thus whether the facts might support a termination defense, *see Twin City Pipe*, 759 F.3d at 885.[10]  There are also unanswered questions about Mr. Zila's actual and apparent authority in relation to terminating the CBA that distinguish the circumstances of this case from the facts before the Eighth Circuit in *Twin City Pipe*. Therefore, the Court finds it is possible that Defendants might have a meritorious defense as to contributions for work performed after March 2015.[11]

---

[10] The Court does not definitively decide at this time whether it is proper to recognize termination as a viable defense in an ERISA action for delinquent contributions. *See Twin City Pipe*, 759 F.3d at 885-86.  The Court encourages the parties to fully brief this issue with reference to any new evidence that becomes available at a later stage in the proceedings.

[11] In recognizing there is a possibility that Defendants could put forward a meritorious defense, the Court keeps in mind a key difference between the present circumstances and those in *Heimerl* and *Twin City Pipe*.  In those cases, the question before the Court was whether the employers gave effective notice to terminate the CBAs as permitted under the CBAs' evergreen clauses, and thus whether the CBA automatically renewed at the end of the term stated on the face of the contract. *Twin City Pipe*, 759 F.3d at 885-86; *Heimerl*, 9 F. Supp. 3d at 1025-26.  In contrast, here Defendants argue the CBA was effectively terminated two years before the CBA's

(Footnote continued on next page.)

### 3.      Accuracy of the Audit

Although the Court has already determined Defendants have posited a potentially meritorious defense, the Court will also consider Defendants' third possible meritorious defense: their argument that the Funds' audit is overstated because it seeks contributions for hours of work not covered by the CBA.   To support this contention, Defendants provide two examples: (1) descriptions of work completed by Allied employee Trent Ranzau on April 7 and 8, 2014, which Defendants argue were inconsistently accounted for in the audit (with one day's work included and the other day's work excluded) (Decl. of Pamela Jewison, Exs. D-E), and (2) similar records for work completed by another Allied employee, Kevin Hunter, on January 26, 2015, which Defendants argue the audit also counted inconsistently (*id.*, Exs. F-G).

The parties agree that in ERISA fund audits, a burden-shifting framework applies, such that where the employer's "records [are] inadequate to determine whether the work they describe[ is] covered by the CBA, the auditor [should] treat[] the work as covered[, given] that ERISA puts the burden on employers to maintain accurate records regarding contributions." *Seipel v. Arrowhead Indus. Serv., Inc.*, No. 07-3864, 2010 WL 605722, at

_____
(Footnote continued.)

stated expiration date.   While Defendants "could not unilaterally terminate the CBA on a different date," *Twin City Pipe*, 759 F.3d at 886, the Court understands the issue to be whether Allied and the Union mutually agreed to terminate the CBA early.   Such a result may be in tension with the express terms of the duration provision in the CBA.   (Second CBA at 18; First CBA at 18.)   But given the "judicial preference for adjudication on the merits," *Oberstar*, 987 F.2d at 504, the Court finds it is proper to allow Defendants to present their case on the merits on this issue rather than entering default judgment.

*4 (D. Minn. Feb. 11, 2010) (citing 29 U.S.C. § 1059(a)(1)).  An employer may rebut an auditor's report by providing "material evidence challenging the legitimacy of [the] audit."  *Laborers' Pension Fund v. Milco Constr., Inc.*, No. 99-374, 2000 WL 1372846, at *4 (N.D. Ill. Sept. 22, 2000).

The Funds assert that Defendants' two examples do not necessarily conflict with the auditor's calculations, and therefore this evidence does not call into question the legitimacy of the audit.  After closely reviewing the evidence, the Court agrees.  If accuracy of the audit alone were the sole defense available to Defendants, the Court would find that Defendants have failed to "proffer[] evidence [that] 'would permit a finding for the defaulting party.'"  *Stephenson*, 524 F.3d at 914 (quoting *Johnson*, 140 F.3d at 785).  However, given that Defendants have another potentially meritorious defense justifying setting aside the default, the Court will permit Defendants to bring forward material evidence rebutting the audit if they so choose.

### C.    Prejudice

In assessing prejudice, the Court focuses on "concrete" harms "such as 'loss of evidence, increased difficulties in discovery, or greater opportunities for fraud and collusion.'"  *Johnson*, 140 F.3d at 785 (quoting *Berthelsen v. Kane*, 907 F.2d 617, 621 (6th Cir. 1990)).  "[P]rejudice may not be found from delay alone or from the fact that the defaulting party will be permitted to defend on the merits."  *Id.*  The core inquiry in assessing prejudice is "whether [a plaintiff's] ability to pursue his [or her] claim will be

hindered." *Iowa State Univ.*, 208 F.R.D. at 605 (quoting *TCI Grp. Life Ins. Plan v. Knoebber*, 244 F.3d 691, 701 (9th Cir. 2001)).

The Funds appear to concede that if the default is set aside, there is little danger of lost evidence, discovery difficulties, or expanded opportunities for fraud and collusion. Instead, the Funds assert that they would be prejudiced because they "would be force[d] to spend additional plan assets in prosecuting the claims against Defendants and because the participants and beneficiaries will be forced to forgo the benefits resulting from the contributions [they] seek in the meantime."  (Pls.' Mem. of Law in Opp. to Defs.' Mot. to Set Aside Default at 36, Feb. 22, 2017, Docket No. 41.)  The Court will address each of these prejudice arguments in turn.

First, while "forcing a party to expend further time and money to collect on a claim as to which there are no meritorious defenses [may] unfairly prejudice[ a] plaintiff to some degree," *Int'l Painters & Allied Trades Union & Indus. Pension Fund v. H.W. Ellis Painting Co.*, 288 F. Supp. 2d 22, 31 (D.D.C. 2003), there is a potentially meritorious defense available to Defendants.  Under these circumstances, the fact that a defaulting party will be permitted to defend on the merits, and therefore, that a plaintiff must expend resources to prosecute on the merits, does not give rise to prejudice that might weigh against setting aside a default.  *See Johnson*, 140 F.3d at 785.  Furthermore, if the Funds are successful on the merits, then they will be entitled to attorney fees, costs, and liquidated damages under the terms of the Agreements and by statute.  29 U.S.C. § 1132(g)(2); (Second CBA at 15-16; First CBA at 15-16.)  Thus, in the end the Funds

are unlikely to suffer prejudice as a result of being forced to expend plan assets prosecuting their claims against Defendants.

Second, the Funds argue that if the default is set aside, they will be prejudiced because they will have to wait to receive money damages until after proving their entitlement to those damages. Without more, this is not the type of prejudice that weighs against setting aside entry of default under Rule 55(c). *See Johnson*, 140 F.3d at 785.

Overall, because Defendants' conduct was excusable, Defendants have demonstrated a fact issue as to whether they have a meritorious defense regarding the effectiveness of the CBA, and the risk of prejudice to the Funds is low, the Court will set aside the clerk's entry of default. The Court will require the parties to establish and adhere to a strict schedule to resolve all remaining issues in the case.

## II.      MOTION FOR ENTRY OF JUDGMENT

Because the Court will grant Defendants' motion to set aside the default, the Court will deny as moot the Funds' motion for entry of judgment. *See, e.g.*, *Metcalf v. E.I. du Pont de Nemours & Co.*, No. 05-1035, 2006 WL 1877069, at *6 (D. Minn. July 6, 2006) (finding same).

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion to Set Aside the Entry of Default [Docket No. 33] is **GRANTED**.

2.      Plaintiffs' Motion for Entry of Judgment [Docket No. 20] is **DENIED**.

3.      The parties are ordered to confer with the Magistrate Judge to establish an

expedited schedule to proceed with motion practice and briefing, as well as discovery if

necessary.  The parties must strictly adhere to the Magistrate Judge's schedule.


DATED:  March 30, 2017                            _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                                      Chief Judge
                                                        United States District Court