UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| GLEN JOHNSON, TIMOTHY GILLEN, KYLE JONES, STEVEN HALL, CLAYTON JOHNSON, MARK HUBBARD, STEVE PIPER, and BILL PATT, *as Trustees of the Operating Engineers Local #49 Health and Welfare Fund;* MICHAEL R. FANNING, *as a Fiduciary of the Central Pension Fund of the International Union of Operating Engineers and Participating Employers;* JOSEPH RYAN, BRUCE CARLSON, GLEN JOHNSON, FRANK FRATTALONE, LEE HILLER, TONY PHILLIPI, GREG WAFFENSMITH, and MARK RYAN, *as Trustees of the Local #49 International Union of Operating Engineers and Associated General Contractors of Minnesota Apprenticeship and Training Program;* THE OPERATING ENGINEERS LOCAL #49 HEALTH AND WELFARE FUND; THE CENTRAL PENSION FUND OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS AND PARTICIPATING EMPLOYERS; and THE LOCAL #49 INTERNATIONAL UNION OF OPERATING ENGINEERS AND ASSOCIATED GENERAL CONTRACTORS OF MINNESOTA APPRENTICESHIP AND TRAINING PROGRAM, | Civil No. 15-3237 (JRT/DTS) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| ALLIED EXCAVATING, INC. and JEFFREY JEWISON, | |
| Defendants. | |

Christy E. Lawrie, **McGRANN SHEA CARNIVAL STRAUGHN & LAMB, CHTD**, 800 Nicollet Mall, Suite 2600, Minneapolis, MN 55402, for plaintiffs.

Mark S. Mathison and Tara C. Adams, **GRAY PLANT MOOTY**, 500 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for defendants.

Plaintiffs are three multi-employer jointly-trusteed fringe benefit plans and their fiduciaries and trustees (collectively the "Funds"). Defendant Allied Excavating, Inc. ("Allied") is an employer who executed a collective bargaining agreement ("CBA") with the Associated General Contractors of Minnesota, Highway, Railroad, and Heavy Construction Division and the Internati No. 49 (collectively, the "Union").[1] Defendant Jeffrey Jewison ("Mr. Jewison") is one of Allied's corporate officers.[2] The Funds seek unpaid contributions and other damages from Defendants. This case is before the Court on the Funds' Motion for Summary Judgment on three issues: (1) whether Defendants can maintain a termination of CBA defense; (2) how much, if any, unpaid contributions exist; and (3) whether Mr. Jewison is personally liable for any unpaid contributions.

The Court will grant the Motion in part and deny it in part, finding that Defendants failed to establish contract termination as a matter of law; a genuine dispute of material facts remains as to the amount of unpaid contributions; and Mr. Jewison is personally liable for certain unpaid contributions.

---

[1] The Funds were created and maintained pursuant to 29 U.S.C. § 186(c) and are administered in accordance with the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (2012).

[2] Allied and Mr. Jewison are collectively referred to as "Defendants."

## BACKGROUND

Defendants and the Union have had a contractual relationship going back to at least 2002. On August 29, 2011, Allied's CEO Pamela Jewison ("Ms. Jewison") executed a CBA with the Union effective May 1, 2011 to April 30, 2014. (Decl. of Michael Streater ("Streater Decl.") ¶ 27, Ex. N ("First CBA"), Feb. 22, 2017, Docket No. 42-2; Aff. of Mike Streater ("Streater Aff.") ¶ 2, Ex. B at 49, Dec. 16, 2015, Docket No. 13-1.) On January 7, 2015, Ms. Jewison executed a subsequent CBA with the Union effective through April 30, 2017. (Streater Aff., Ex. A ("Second CBA"); Ex. B at 50.) At all relevant times, the applicable CBA required Allied to make monthly contributions to the Funds on behalf of employees for hours worked on tasks covered by the CBA.[3] (First CBA at 15-17; Second CBA at 15-17.)

Prior to the execution of the relevant CBAs, on March 16, 2002, Mr. Jewison (then CEO of Allied) executed the Operating Engineers Local #49 Health and Welfare Fund Participating Agreement ("Welfare Participating Agreement"). (Streater Aff., Ex. C.) The Welfare Participating Agreement, which complements the CBA in force at any given time, specifically obligates Allied to make contributions to the Operating Engineers Local #49 Health and Welfare Fund (the "Health & Welfare Fund") as specified in the applicable CBA, and it also purports to bind in an individual capacity any corporate officer signing on behalf of an employer. (*Id.*) The Welfare Participating Agreement is "in effect for the

---

[3] All page references to the CBAs are to internal pagination as opposed to CM/ECF pagination.

period stipulated in [the CBA applicable at the time of execution] and any renewal or extension thereof." (*Id.*)

1. **Termination of the Second CBA**

The duration provision of the Second CBA provides:

> ARTICLE 25 – DURATION
> 25.01 All terms of this Agreement shall take effect on May 1, 2014. Wage and benefits for the 2014 year only will start on May 5th, 2014.
>
> 25.02 This Agreement shall remain in full force and effect through April 30, 2017.
>
> 25.03 Any party has the right to terminate or amend this Agreement by giving notice to the other party, sixty (60) days before the expiration of this Agreement. Failure to give such notice shall cause this Agreement to be renewed automatically for a further period of twelve (12) months.
>
> 25.04 In the event such written notice is given and a new Agreement is not signed before the expiration of this Agreement, then this Agreement shall continue in force until a new Agreement is signed, or until negotiations are formally broken off, or until a strike or lockout occurs.

(Second CBA at 18.) Defendants allege that they terminated the Second CBA in March 2015. Defendants cite to the following as evidence of that termination.

A day after Allied was notified that an audit would be conducted, a representative from the audit company inquired whether Pam Riley, a Union representative, knew whether Allied changed its name to Vortech Hydro Vac ("Vortech") because that was the name on a remittance report. (Decl. of Mark Mathison ("Mathison Decl.") ¶ 2, Ex. A at 2, Dec. 21, 2018, Docket No. 90-1.) Riley responded that she did not know, and that "[t]hey'll have to sign everything again under the new name." (*Id.*)

On or about March 9, 2015, Ms. Jewison had a conversation with Douglas Zila, then Treasurer and Area Business Representative of the Union, asking him if the Second CBA could be terminated because the covered work performed by Allied employees had begun to be performed by Vortech employees instead. (Decl. of Pamela Jewison ("Pamela Decl.") ¶ 3, Feb. 15, 2017, Docket No. 36.) Zila informed Ms. Jewison that as long as Vortech was under contract with the Union then the Second CBA would be terminated. (*Id.*) Ms. Jewison spoke with Zila again on March 17, 2015 and Zila confirmed that as long as Vortech was under contract with the Union, Allied would be released from the Second CBA. (*Id.* ¶ 4.) Zila told Ms. Jewison that he had confirmed this information with Glen Johnson, the Business Manager for the Union and trustee of two of the Plaintiff-funds. (*Id.*) On March 26, 2015, Zila visited Allied's offices and brought new agreements for Vortech to sign. (*Id.* ¶ 5, Ex. A at 2, Docket No. 36-1; Supp. Decl. of Pamela Jewison ("Supp. Pamela Decl.") ¶ 2, Dec. 21, 2018, Docket No. 92.) At that meeting, Ms. Jewison, as a representative for Vortech, signed a new Acceptance of Agreement to be bound to the CBA. (Pamela Decl. ¶ 5, Ex. A at 2.) Ms. Jewison states that Zila held himself out as the representative for both the Union and Funds, and that she and Mr. Jewison believed that Zila had the authority to terminate the Second CBA. (Pamela Decl. ¶ 6.)

On April 6, 2015, Melissa Urban-Brown, a Supervisor in Auditing and Collections with Wilson-McShane, (Mathison Decl. ¶ 3,) emailed Michael Streator, the auditor performing the audit on Allied, to "do the audit through current and make it a **final** audit," because Allied had not re-signed the CBA under Allied, (*Id.* ¶ 4, Ex. C at 6.)

In April 2015—post "termination" of the Second CBA—Allied delivered a contribution to the Health Fund for covered work performed in March 2015, prior to the termination of the Second CBA. (Pamela Decl. ¶ 7.) The payment was rejected with the following message:

> We have received information from the Local #49 letting us know that Allied Excavating, Inc. is no longer in compliance with the union agreements and that Vortech Hydro Vac has replaced the company. Given the information we've received, we are not able to accept any contributions from Allied Excavating, Inc. If you wish to contribute on a Non-Bargaining basis, you will need to sign an agreement under Vortech Hydro Vac. Please contact your area business representative to do so.

(*Id.*, Ex. C at 2.)

In March of 2016, the Funds informed Allied that the Second CBA had not been terminated and that the audit would be extended to cover all of 2015 in addition to 2014 and requested the records for the remaining period of 2015. (Decl. of Christy E. Lawrie ("Lawrie Decl.") ¶ 4, Ex. B at 5-6, Feb. 22, 2017, Docket No. 45.) Requests for the original documentation were first made in February of 2016. (*Id.* at ¶ 3.) In response, Allied sent a letter stating "[a]s of March 2015, Allied Excavating, Inc., is no longer part of the Local 49 Operators & Engineers Union. Our contract was void, per Doug Zila, once Vortech Hydro Vac sign [sic] an agreement with the Local 49er, which was complete on March of 2015." (Supp. Pamela Decl. ¶ 3, Ex. A at 2.) Despite taking this position, Allied complied with the additional document request for 2015 records extending beyond March 2015. (Lawrie Decl. ¶¶ 6-7, Ex. C at 8.)

On February 28, 2017, Allied notified the Union that it was terminating the Second CBA. (Suppl. Decl. of Christy E. Lawrie ("Lawrie Supp. Decl.") ¶ 4, Ex. J at 32-33, Nov. 30, 2018, Docket No. 87-1.)

**2. The Audit**

The CBA gives the Funds the right to examine Allied's payroll and employment records at any reasonable time to determine if the company is in compliance with its fringe benefit obligations. (Second CBA at 16; First CBA at 16.) Pursuant to this authority, in February 2015, the Funds selected Allied for an audit and requested access to Allied's records going back to January 1, 2014. (Streater Decl. ¶ 2, Ex. F.) After numerous unanswered requests over many months, (*Id.* ¶¶ 2-7), on August 7, 2015, the Funds filed this lawsuit pursuant to 29 U.S.C. § 1145. The Funds originally sought injunctive relief requiring Allied to provide the requested documents. (Compl. at 9, Aug. 7, 2015, Docket No. 1.) The Funds also sought to collect any unpaid contributions as well as attorney fees and damages as permitted under the terms of the CBA and by statute.[4] (*Id.*)

---

[4] The CBA provides that if an employer becomes "delinquent" in terms of their fringe benefit contributions, the Funds are entitled to liquidated damages equal to fifteen percent of the unpaid contributions as well as all costs of collection including attorney fees and costs. (Second CBA at 15-16; First CBA at 15-16.) In addition, ERISA entitles plan fiduciaries to certain damages upon entry of judgment in an enforcement action for delinquent contributions as follows:

> In any action . . . by a fiduciary for or on behalf of a plan to enforce [29 U.S.C. §] 1145 . . . in which a judgment in favor of the plan is awarded, the court shall award the plan –
>
> (A)     the unpaid contributions,
> (B)     interest on the unpaid contributions,

Eventually, on September 16, 2015, Defendants provided the auditor access to selected documents. (Streater Decl. ¶ 11.) After additional requests from Plaintiffs, Allied provided still more records between January 25 and April 18, 2016 that had not previously been provided. (Streater Decl. ¶¶ 12-14; Lawrie Decl. ¶¶ 4-7.)

Based on the documents Defendants provided, in April 2016 the Funds' auditor completed an audit invoice. (Aff. of Michael Streater ¶ 6, July 18, 2016, Docket No. 23.) The auditor concluded that Defendants owed $158,462.54 in delinquent contributions, of which $76,583.38 was owing to the Health & Welfare Fund. (*Id.*) In addition, the auditor determined the Funds were entitled to $23,769.38 in liquidated damages, $11,487.51 of which is due to the Health & Welfare Fund. (*Id.* ¶ 7.) The auditor sent a copy of the audit invoice to Allied on May 2, 2016. (Streater Decl. ¶ 18.)

In September 2016, Defendants provided additional documents to the Funds. (*Id.* ¶ 22.) As a result of this new information, the Funds revised their audit, removing 2,865 hours of work. (Streater Decl. ¶ 23.) This reduced the total delinquent contributions by $47,000. (*Id.*)

On November 30, 2018, the Funds filed a Motion for Summary Judgment that addressed three legal issues: (1) whether Defendants can maintain a termination of CBA

---

(C) [liquidated damages provided for under the plan not to exceed twenty percent]

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2).

defense; (2) how much, if any, unpaid contributions exist; and (3) whether Mr. Jewison is personally liable for any unpaid contributions (Mot. for Summ. J., Nov. 30, 2018, Docket No. 83.)

## ANALYSIS

**I.      Summary Judgment**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256. But "[w]here the moving party fails to satisfy its burden to show initially the absence of a genuine issue concerning any material fact, summary judgment must be denied even if no opposing evidentiary matter is presented." *Foster v. Johns-Manville Sales Corp.*, 787 F.2d 390, 393 (8th Cir. 1996).

## A. Effectiveness of the CBA

Defendants raise a termination defense to unpaid contributions owed after the alleged termination in March 2015. In interpreting a CBA, a court "must construe the contract as a whole," *Amcar Div., ACF Indus. Inc. v. NLRB*, 641 F.2d 561, 569 (8th Cir. 1981), and read the terms of the agreement "in their context," *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 281 (1956). Furthermore, absent ambiguity a court will interpret the CBA and give force to its provisions without extrinsic evidence. *See Cent. States, Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co.*, 919 F.2d 1343, 1349 (8th Cir. 1990).

The Second CBA is not ambiguous about whether it can be terminated prior to the expiration of its original term. Section 25.02 clearly states that the Second CBA is "in full force and effect through April 30, 2017." (Second CBA at 18.) The Second CBA allows for termination if a party gives notice to the other sixty days before the expiration of the Second CBA, otherwise the agreement is automatically renewed for twelve more months. That the termination right is grouped with the renewal term shows that termination only applies to those renewal terms and not the original term. Thus, Defendants could not have terminated the Second CBA in March 2015, a full two years prior to the expiration of the Second CBA.

Regardless, termination of a CBA is not a defense in an ERISA action under 29 U.S.C. § 1145. "Congress intended that [§ 1145] would simplify actions to collect delinquent contributions, avoid costly litigation, and enhance the actuarial planning necessary to the administration of multiemployer pensions plans." *Cent. States*, 919 F.2d

at 1348. Under the scheme Congress enacted, pension funds bringing suit to collect delinquent contributions are in "a better position than [they] would otherwise occupy in relation to the collective bargaining agreement" if they were treated as ordinary third-party beneficiaries under existing contract law. *Id.* Thus, "suit [by a trustee] cannot be thwarted by defenses not apparent from the face of the [a]greement." *Id.* at 1349 (quoting *Bituminous Coal Operators' Ass'n, Inc. v. Connors*, 867 F.2d 625, 634 (D.C. Cir. 1989) (alteration in original)). The Eighth Circuit has only recognized two defenses in such an action: (1) "that the pension contributions are themselves illegal or [(2)] that the collective bargaining agreement is void." *Id.*

A number of other circuits, as well as district courts in this circuit, have recognized that termination of the underlying CBA is an additional defense that may be available in such an action. *See Heimerl v. Tech Elec. of Minn., Inc.*, 9 F. Supp. 3d 1002, 1021-22 (D. Minn. 2014) (recognizing termination as a defense and collecting cases from other jurisdictions that have held the same). The Eighth Circuit recently addressed this question and declined to recognize a termination defense based on the facts before it. *See Twin City Pipe Trades Serv. Ass'n, Inc. v. Frank O'Laughlin Plumbing & Heating Co.*, 759 F.3d 881, 885-86 (8th Cir. 2014) ("We decline to formally recognize a termination defense in this case . . . because the circumstances involved here would not support such a defense in any event."). Furthermore, in rejecting a termination defense in *Twin City Pipe*, the Eighth Circuit explained that the termination did "not evince the unequivocal intent necessary to terminate participation in a CBA." *Id.* at 885. Similarly, here, Defendants have pointed to some evidence of termination, however, that evidence is mired in doubt and counter-

evidence and does not show the "clear and explicit" intent required to terminate the Second CBA. *Id.* (quoting *Int'l Union of Operating Eng'rs, Local No. 181 v. Dahlem Constr. Co.*, 193 F.2d 470, 475 (6th Cir. 1952)). Thus, the Court finds that, as a matter of law, Defendants have failed to show that the Second CBA was terminated, nor that termination is a defense available to them.

### B. Accuracy of the Audit

Plaintiffs produced an audit report that outlines the total amount Plaintiffs claim Defendants owe. In response, Defendants produced an affidavit from Ms. Jewison, and some documents that they claim support Ms. Jewison's position that some of the hours included in the audit were not for covered work and thus should be excluded from the audit. Defendants also allege that Streater, the auditor, used an inconsistent methodology to count covered hours. Combined, these two pieces of evidence create a genuine dispute of material facts.

Defendants argue that Streater's audit is unreliable because of his inexperience, general lack of knowledge of the Second CBA, and multiple revisions to the audit report. After reviewing the deposition record, it is clear that Streater's auditing experience and knowledge of the Second CBA is sufficient to render his audit report reliable. Streater had several years of auditing experience at the time he conducted the audit, and he was able to accurately identify relevant sections of the Second CBA for purposes of determining covered work hours. That Streater sought a second opinion from his supervisor does not show that he lacked knowledge of the Second CBA. Furthermore, Defendants' argument that Streater's audit report is unreliable because he submitted multiple revisions is

disingenuous. It was Defendants' failure to produce records that caused Streater to continually revise his report; he only revised reports when new information was provided by Defendants.

Plaintiffs argue that they are entitled to summary judgment on this issue because, after applying the burden-shifting framework some circuits and district courts within this district have adopted.[5] The Court, however, declines to adopt a burden-shifting framework at the summary judgment stage. Although other circuits and district courts have applied a burden-shifting framework at summary judgment in similar cases, there is no consensus.[6] Furthermore, the Eighth Circuit has not addressed whether burden-shifting is appropriate at the summary judgment stage, thus, the Court declines to adopt it here. The Court notes, however, that burden-shifting applies at trial. Other circuits and judges in this district have adopted it at that stage of a proceeding, and this Court finds their reasoning to do so compelling. *See supra* fn.5.

---

[5] *See Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc.* 30 F.ed 692, 695-96 (6th Cir. 1994); *Brick Masons Pension Trust v. Indus. Fence & Supply, Inc.*, 839 F.2d 1333, 1337-39 (9th Cir. 1988); *Combs v. King*, 764 F.2d 818, 827 (11th Cir. 1985); *Nali v. MaxPro Flooring, LLC*, Civ. No. 09-3625 (MJD/JJK), 2013 WL 673779, at *7-8 (D. Minn. Feb. 25, 2013); *Seipel v. Arrowhead Indus. Service, Inc.*, Civ. No. 07-3864 (PJS/RLE), 2010 WL 605722 (D. Minn. Feb. 11, 2010).

[6] *Compare Combs*, 764 F.2d at 827 (holding that burden shifting applies in ERISA cases at the summary judgment stage) *with Ill. Conference of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1367 (7th Cir. 1995) (holding that an employer need only produce evidence to raise doubts on the accuracy of an ERISA plaintiff's unpaid contribution calculation to survive summary judgment).

Although after-the-fact self-serving affidavits alone do not create a genuine dispute of material facts,[7] Defendant's assertion that some hours are not covered under the CBA is generally supported by Ms. Jewison's affidavit providing explanations on why certain hours are not covered, and some documentary evidence supporting those explanations. This is sufficient to raise a genuine dispute of material facts. Therefore, the Court will deny Plaintiffs' Motion on this issue.

**C. Mr. Jewison's Personal Liability**

Plaintiffs allege that Mr. Jewison is personally liable for all unpaid contributions as a result of executing the Welfare Participating Agreement, and Defendants have not disputed this fact. Further, the Court has already held that "Defendants' argument as to Mr. Jewison's liability fails as a matter of law. The Court finds there is no likelihood that this defense will be meritorious if the default is set aside." (Mem. Op. and Order Setting Aside Entry of Default at 15, Mar. 30, 2017, Docket No. 49.) Therefore, the Court will grant summary judgment on this issue and find that Mr. Jewison is personally liable for any damages stemming from the Welfare Participating Agreement.

This case will be placed on the Court's next trial calendar.

---

[7] *Boards of Trustees of Ohio Laborers' Fringe Ben. Programs v. Jenkins*, 283 Fed. Appx. 315, 319 (6th Cir. 2010) ("conclusory affidavits . . . asserting that contributions were not due for work performed by non-laborer 'policemen,' did not generate a question of material fact."); *see also Trustees of Local 807 Labor-Management Health & Pension Funds v. River Trucking and Rigging, Inc.*, No. CV-03-3659JMA, 2005 WL 2290579 at *6 (E.D.N.Y. Sept. 20, 2005) (holding that two affidavits from challenged employees explaining why their pay was not subject to the CBA were, alone, insufficient to raise a genuine issue of material fact).

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment [Docket No. 83] is **GRANTED** in part and **DENIED** in part as follows:

    a. The Motion regarding the issue of termination of the Second CBA is **GRANTED;**

    b. The Motion regarding the issue of unpaid contributions is **DENIED;**

    c. The Motion regarding the issue of Mr. Jewison's personal liability for unpaid contributions is **GRANTED.**

DATED: August 8, 2019　　　　　　_____
at Minneapolis, Minnesota.　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　Chief Judge
　　　　　　　　　　　　　　　　　　United States District Court